

# In The
# Court of Appeals
# Seventh District of Texas at Amarillo

_____

No. 07-17-00262-CR
_____

SAMUEL MASCORRO, APPELLANT

V.

THE STATE OF TEXAS, APPELLEE

On Appeal from the 108th District Court
Potter County, Texas
Trial Court No. 74,082-E, Honorable Douglas R. Woodburn, Presiding

November 6, 2018

MEMORANDUM OPINION

Before QUINN, C.J., and PIRTLE and PARKER, JJ.

Appellant, Samuel Mascorro, was convicted of aggravated robbery following a jury trial.[1] The jury found appellant guilty and found the deadly weapon allegation to be true. The applicable range of punishment was enhanced by a prior felony conviction of aggravated assault with a deadly weapon.[2] The jury assessed appellant's punishment at life in prison in the Texas Department of Criminal Justice—Institutional Division. On

---

[1] TEX. PENAL CODE ANN. § 29.03(a)(1) (West 2011).

[2] TEX. PENAL CODE ANN. § 12.42(c) (West Supp. 2018).

appeal, appellant contends that the trial court erred in refusing to include a jury instruction on temporary insanity caused by voluntary intoxication. We affirm.

## Background

During the evening hours of July 19, 2015, Sherwood Anderson met a few friends to have a beer at Buster's Bar. Shortly before 11:45 p.m., the group decided to relocate to the Western Horseman lounge. Anderson drove by himself and parked his Suburban in a near-by parking lot. As he was walking toward the lounge, he felt somebody behind him, and then "bam, I was shot." Anderson fell to the ground "on all fours" and felt someone trying to pull his billfold out of the back pocket of his jeans. Anderson saw the silhouette of the man who shot him as the shooter entered the passenger side of a pickup parked nearby. Anderson managed to get to his feet and stumble into the lounge door. The lounge doorman summoned the police and an ambulance.

Phillip Endrizzi had been at the Western Horseman that evening to listen to the band. As he and his wife were walking to the parking lot to leave, Endrizzi heard a gunshot. Endrizzi looked in the direction of the gunshot and saw a white and gray Dodge pickup being driven "a little bit fast" out of the parking lot. He noted the pickup's tag number and gave it to the police.

Amarillo police officer Matthew Biernacki responded to the scene of the shooting. When he arrived at the Western Horseman, two persons were attending to Anderson. Endrizzi gave Officer Bernacki a description of the suspect vehicle and tag number. Officer Biernacki broadcast that information over the police radio.

Dr. Izi Obokhare, a trauma surgeon at Amarillo's Northwest Texas Hospital, treated Anderson at the emergency room for life-threatening injuries. Anderson was intubated, stabilized, and transferred to University Medical Center in Lubbock. Anderson was not fully conscious until approximately six weeks following the shooting. Anderson endured extensive surgery to repair his fractured jaw and his rehabilitation process was lengthy. He suffers lingering injuries as a result of the gunshot to the back of his head. His jaw constantly aches and does not align properly. He suffers from dizzy spells and is not able to chew any hard foods. Anderson still has bullet fragments in his head.

Early in the morning following the shooting, Patricia Mascorro, appellant's sister, was awakened by her boyfriend, Gavino Valdiviez. He told her that appellant and appellant's girlfriend, Amber Gomez, had been at their residence. According to Gavino, appellant and Amber went into the kitchen and Gavino "heard something being dropped" into a kitchen drawer. After appellant and Amber left, Gavino discovered a gun and a wallet in one of their kitchen drawers. Gavino also noticed that a pair of his shoes were missing and that someone else's shoes were left where his shoes were kept. Patricia opened the wallet and saw that it belonged to an elderly man. Patricia told Gavino "to get rid of" the gun, so he tossed it in a dumpster in the alley. The next day, Patricia learned about the incident at the Western Horseman from a Facebook posting. Realizing that her brother may have been involved in that incident, she and Gavino retrieved the gun and called the police.

When police officers interviewed Patricia and Gavino, detectives had already located an address from the tag on the suspect vehicle. The Dodge pickup seen leaving the parking lot of the Western Horseman was registered to Amber's father. With the

information they learned from Patricia and Gavino, the police connected the gun to the robbery and determined that appellant and Amber were in the vehicle on the night of the robbery. While speaking with Patricia, the officers were notified that the vehicle connected to the crime had been located at 5407 Tradewinds, the residence of Amber's parents. Later that evening, Appellant and Amber were arrested for aggravated robbery.

As part of a plea agreement, Amber testified against appellant about the events of July 19, confirming his involvement as well as their concealment of the gun and wallet at the home of appellant's sister. Amber also stated that she and appellant "were on meth" and he had been drinking that evening.

Appellant was indicted for aggravated robbery. The indictment also contained a deadly weapon notice and an enhancement paragraph alleging that on a prior occasion appellant had been convicted of aggravated assault with a deadly weapon. Appellant pled not guilty to the charges contained in the indictment and not true to the deadly weapon allegation. Following a jury trial, appellant was found guilty by the jury who also found the deadly weapon allegation true.

At the punishment phase of the trial, Anderson's daughter testified about the impact the shooting had on her father as well as their family. Her father is not the same man that he was previously. Before this incident, Anderson was seventy-six years old and "never met a stranger, loved life; loved people." Now, he struggles, and the recovery process has been difficult.

The State introduced evidence of appellant's multiple prior convictions, including a 2007 conviction for aggravated assault with a deadly weapon. The victim in the 2007

4

conviction, Matthew Peek, testified that he was shot by appellant in a drive-by shooting at an Amarillo nightclub. He expressed regret that, if he had pushed for a harsher prison sentence for appellant, perhaps Anderson would not have been a victim.

Appellant presented mitigation evidence through the testimony of several of his family members and friends. Appellant was described as a "good kid" and a leader. He excelled in athletics during his high school years and was a football star. At some point, appellant developed a drug problem and began to use methamphetamine. He hid his drug use from his family.

Dr. Steven Schneider, a clinical psychologist, testified to appellant's behavior and functioning. Dr. Schneider reviewed appellant's medical records from North Texas State Hospital and River Crest Psychiatric Hospital, and reports from doctors who evaluated appellant's competency and sanity. He also administered psychological testing. According to Dr. Schneider, appellant suffers from amphetamine psychosis due to his history of use of multiple substances including crank, methamphetamine, marijuana, and alcohol. Dr. Schneider concluded that appellant has a moderate neurocognitive disorder which might be congenital, a result of injury, or induced by drug use. Appellant also suffers from anxiety and depression.

Appellant indicated to Dr. Schneider that, before the occurrence, "there had been very little sleep in the last number of days, weeks maybe, and [appellant] had been doing methamphetamine, drinking, doing marijuana." Dr. Schneider testified that appellant's drug use diminished his capacity to think, however, appellant was not temporarily insane when committing the offense. According to Dr. Schneider, appellant had impaired

5

judgment "because of his–the substances that he had been ingesting," but appellant had some understanding of what he had done because he hid the gun and changed his clothes after the robbery. In his interview with Dr. Schneider about the evening in question, appellant claimed "he couldn't remember it."

At the punishment charge conference, appellant's counsel objected to the charge and asked the court to include an instruction tracking Penal Code section 8.04 contending that the evidence raised the issue of voluntary intoxication at the time the offense was committed. The requested instruction was denied. The jury found the enhancement allegation true and assessed appellant's punishment at imprisonment in the Texas Department of Criminal Justice, Institutional Division, for a term of life.

Standard of Review

In one issue, appellant contends the trial court should have instructed the jury at the punishment phase regarding the mitigating issue of temporary insanity due to intoxication. Appellate review of purported jury charge error involves a two-step process. *Kirsch v. State,* 357 S.W.3d 645, 649 (Tex. Crim. App. 2012). First, we determine whether error occurred. Second, if error occurred, we analyze that error for harm. *Id.* Our consideration of the degree of harm necessary for reversal depends on whether error was preserved. *Middleton v. State*, 125 S.W.3d 450, 453 (Tex. Crim. App. 2003). We review a trial court's decision not to submit an instruction for an abuse of discretion. *See Westbrook v. State*, 29 S.W.3d 103, 122 (Tex. Crim. App. 2000).

Analysis

An accused is entitled to an instruction on every defensive or mitigating issue raised by the evidence. *See Arnold v. State*, 742 S.W.2d 10, 13 (Tex. Crim. App. 1987). Voluntary intoxication is not a defense to the commission of a crime; but evidence of temporary insanity caused by intoxication may be introduced by the actor in mitigation of his punishment. TEX. PENAL CODE ANN. § 8.04(a), (b) (West 2011).[3] However, before it is necessary for the trial court to affirmatively instruct the jury on voluntary intoxication as mitigating evidence at the punishment stage of the trial, the defendant must establish that he was intoxicated and that the intoxication rendered him temporarily "insane." *San Miguel v. State*, 864 S.W.2d 493, 495-96 (Tex. Crim. App. 1993) (en banc); *Arnold,* 742 S.W.2d at 14. To do this, the affirmative defense of insanity[4] is considered together with the mitigation issue of temporary insanity due to intoxication. *Arnold,* 742 S.W.2d at 14. Thus, the defendant must establish that his voluntary intoxication caused him to not know his conduct was wrong. *Id.* at 13-14; *Johnson v. State*, 452 S.W.3d 398, 407 (Tex. App.—Amarillo 2014, pet. ref'd). He must do more than merely present evidence of intoxication. *Arnold,* 742 S.W.2d at 14.

When to give the mitigation instruction for temporary insanity due to intoxication is more problematic than most defensive or mitigation instructions. The often stated standard for giving any defensive-type instruction is, "[a]n accused is entitled to an instruction on every defensive or mitigating issue raised by the evidence . . . regardless

---

[3] Further reference to provisions of the Texas Penal Code will be by reference to "section __" or "§ __."

[4] Insanity is an affirmative defense to prosecution that, at the time of the conduct charged, the actor, as a result of severe mental disease or defect, did not know that his conduct was wrong. § 8.01(a).

7

of whether the evidence is strong or weak, unimpeached or contradicted and regardless of whatever the trial judge may think about the credibility of the evidence." *Id.* at 13. This standard indicates that "some" evidence is sufficient. *Trevino v. State*, 100 S.W.3d 232, 238 (Tex. Crim. App. 2003). In determining whether a defense is raised, the court must rely on its own judgment, formed in the light of its own common sense and experience, as to the limits of rational inference from the facts proven. *Shaw v. State*, 243 S.W.3d 647, 658 (Tex. Crim. App. 2007). The evidence presented must be such that it will support a rational jury finding as to each element of the defense or mitigation issue.[5] *Id.*

Appellant points to Dr. Schneider's testimony describing appellant's neurocognitive deficits due to his history of methamphetamine use, and Amber's testimony that appellant used methamphetamine and was drinking the night of the robbery, as evidence necessitating that the requested instruction be included in the charge. However, appellant's use of methamphetamine on the day of the robbery does not show he was *intoxicated* at the time of the robbery. *See* § 8.04(d) (defining intoxication). There was no testimony about the quantity of any substance ingested by appellant. *See Miniel v. State*, 831 S.W.2d 310, 320 (Tex. Crim. App. 1992) (no instruction under Penal Code section 8.04 required when evidence shows defendant "shotgunning" beer and smoking marijuana before the offense, but does not specify the quantity of substance ingested). Further, there was testimony from Dr. Schneider that appellant was not "temporarily insane" at the time of the offense. Dr. Schneider opined that appellant knew his conduct was wrong because appellant hid the gun and changed

---

[5] The elements of the mitigation issue of temporary insanity due to intoxication are: 1) intoxication, and 2) such intoxication was sufficient to render the defendant temporarily insane. *See Arnold*, 742 S.W.2d at 14.

his clothes after the robbery.  After shooting Anderson, appellant jumped into the pickup and directed Amber to drive away from the scene.  At his sister's residence, appellant hid his gun and Anderson's wallet in a kitchen drawer.  This evidence refutes the suggestion that appellant was unaware that what he was doing was wrong.  *See Arabie v. State*, 421 S.W.3d 111, 117-18 (Tex. App.—Waco 2013, pet. ref'd) (defendant's disposal of murder weapon tended to show he knew what he was doing).

Because appellant failed to present evidence of temporary insanity as a result of voluntary intoxication, the trial court did not err in refusing to submit the requested instruction.  Appellant's issue is overruled.

## Conclusion

The judgment of the trial court is affirmed.

Judy C. Parker
Justice

Do not publish.